# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00088-CR

## Ex parte Danny Ray Digman

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
## NO. 1030857, HONORABLE BOB PERKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Danny Ray Digman is confined in lieu of $1,000,000 bail while awaiting trial on an indictment accusing him of securities fraud and other related offenses. *See* Tex. Rev. Civ. Stat. Ann. art. 581-29 (West Supp. 2004). Digman petitioned for a writ of habeas corpus urging that the amount of bail is unreasonable and asking that it be reduced to an unspecified amount. The writ issued, and after a hearing, relief was denied. We will order bail reduced to $150,000.

With certain exceptions not applicable to Digman, the Texas Constitution guarantees that "[a]ll prisoners shall be bailable by sufficient sureties." Tex. Const. art. I, § 11; *see* Tex. Code Crim. Proc. Ann. art. 1.07 (West 1977). Both the federal and state constitutions prohibit excessive bail. U.S. Const. amend. VIII; Tex. Const. art. I, § 13; *see* Tex. Code Crim. Proc. Ann. art. 1.09 (West 1977).

The code of criminal procedure commits the setting of bail to the discretion of the trial court or magistrate, but sets forth five rules that, together with the constitution, govern the

exercise of that discretion. Tex. Code Crim. Proc. Ann. art. 17.15 (West Supp. 2004). Bail should be sufficiently high to give reasonable assurance that the undertaking will be complied with, but not so high as to make it an instrument of oppression. *Id*. art. 17.15(1), (2); *see Ex parte Vasquez*, 558 S.W.2d 477, 479 (Tex. Crim. App. 1977) (primary purpose of pretrial bail is to secure presence of defendant). The nature of the offense and the circumstances under which it was committed are factors to be considered in setting bail, as is the future safety of the community and the victim of the alleged offense. Tex. Code Crim. Proc. Ann. art. 17.15(3), (5). The defendant's ability to make bail also must be considered, but is not of itself controlling. *Id*. art. 17.15(4); *Ex parte Gentry*, 615 S.W.2d 228, 231 (Tex. Crim. App. 1981). In applying article 17.15, consideration may be given to such evidentiary matters as the defendant's work record, ties to the community, previous criminal record, and record of appearances in the past. *See Ex parte Williams*, 619 S.W.2d 180, 183 (Tex. Crim. App. 1981); *Gentry*, 615 S.W.2d at 231; *Ex parte Parish*, 598 S.W.2d 872, 873 (Tex. Crim. App. 1980); *Ex parte Keller*, 595 S.W.2d 531, 533 (Tex. Crim. App. 1980).

The burden is on the accused to prove that bail is excessive. *Ex parte Rubac*, 611 S.W.2d 848, 849 (Tex. Crim. App. 1981). We review the trial court's ruling for an abuse of discretion. *Id*. at 850.

The record reflects that Digman was the founder, chairman, and part owner of PaymentWorks, a Texas corporation. PaymentWorks and its subsidiaries sold possessory interests in automated teller machines which it placed in various locations in Texas and other states. PaymentWorks sent the investors monthly checks supposedly representing their share of the transaction fees paid by users of the machines. The State contends that the possessory interests sold

by PaymentWorks were investment contracts subject to the Texas Securities Act. The indictment alleges that Digman engaged in securities fraud by failing to disclose to investors that he sold interests in the same ATM machine to multiple investors, falsely represented the revenues derived from the machines, and had four criminal convictions in state and federal courts. The indictment alleges that pursuant to this fraud, Digman sold investment contracts worth $132,905 to eight named investors. Other counts accused Digman of selling unregistered securities and selling securities without being a registered dealer or agent. Digman's common law wife Lori Burrow, who was PaymentWorks's president and co-owner, was also indicted for her participation in the scheme.[1]

The securities board began its investigation of PaymentWorks in October 2003. In late November, authorities executed a search warrant and seized the company's records and assets. Immediately thereafter, Digman and Burrow moved to Colorado. Burrow remained in Colorado with family members, but Digman soon moved to Amarillo. Although Digman and Burrow knew there were outstanding warrants for their arrest, they did not return to Austin until January 20, 2004.

Letha Sparks, an investigator for the state securities board, testified that PaymentWorks took in about $4,000,000 from over one hundred investors in 2002 and 2003, of which about $147,000 remained in bank accounts seized by the board. Although PaymentWorks had sold interests in over one thousand ATMs, Sparks was able to confirm the existence of only a few hundred machines. Sparks testified that in 2003, PaymentWorks paid $5 to investors for every $1 that it received in transaction fees. In effect, she described PaymentWorks as a Ponzi scheme:

---

[1] Burrow's bail was also set at $1,000,000. She also sought a reduction, and the two causes were heard together below. Although the court denied relief, Burrows did not appeal to this Court.

payments to existing investors did not come from its business activities, but from the money received from new investors.

Burrow's daughter, Crystal Burrow, testified that she was employed by PaymentWorks as a secretary. Crystal said that PaymentWorks paid her $750 per week, and that her mother was paid $1000 per week. Crystal testified that she "personally did the paperwork on [PaymentWorks's ATM machines] and made sure that they were there, they were hooked up, they were working." She was confident that PaymentWorks had more than one thousand machines in operation.

Burrow's brother, Jamie Springer, also testified at the hearing. Springer worked for PaymentWorks as a technician, for which he was paid $700 per week. Springer testified that he personally installed or serviced over five hundred ATM machines in different locations.

Digman estimated that he was paid $90,000 by PaymentWorks in 2003. He said that he and Burrow were attempting to sell their home, on which they owe $237,000, for $284,000. According to Digman, his only other assets are a pickup truck worth $5000 and a checking account containing about $400. Digman testified that he could afford a $50,000 bond, and could perhaps pay for a $100,000 bond with the help of his family.[2] He could not afford a $200,000 bond.

Digman had lived in Austin for just under six years before leaving in November 2003. His father also lives in Austin, but his mother lives in Amarillo; Digman said that he intended to live with his mother if released on bond. Before starting PaymentWorks, Digman had been in the

---

[2] The State understands Digman to say that he could raise $100,000 in cash. Although Digman's statement was ambiguous, the context indicates that he was referring to a $100,000 bond.

wrecker business in Austin and Amarillo for twenty years. He acknowledged previous convictions for auto theft, theft by check, and tax fraud. Digman's counsel referred to an outstanding parole warrant during argument to the court, which suggests that he is on parole for one of his previous convictions.

In reviewing a trial court's ruling for an abuse of discretion, an appellate court will not intercede as long as the ruling is at least within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). But an abuse of discretion review requires more of the appellate court than simply deciding that the trial court did not rule arbitrarily or capriciously. *Id*. at 392. The appellate court must instead measure the trial court's ruling against the relevant criteria by which the ruling was made. *Id*.

Digman stands accused of a nonviolent property offense, and although he has a criminal record, he has no convictions for crimes of violence. There is no evidence that he represents a continuing threat to the victims of the alleged fraud or to the public. There is evidence that PaymentWorks took in over $4,000,000 during its year-and-a-half of operation, but there is no evidence that any of this money remains in Digman's possession or that Digman has any assets other than his share of the equity in the house he owns with Burrows, a pickup truck, and $400 in cash.

The trial court could reasonably infer that Digman fled from Austin in November 2003 to avoid arrest. Digman does not appear to have significant ties to Austin or Travis County. Although his father lives in Austin, Digman indicated that he would live in Amarillo with his mother if allowed to do so. On the other hand, the trial court has the authority to condition bail on Digman

5

remaining in Travis County, and the court can impose other conditions designed to assure his presence for trial.  *See* Tex. Code Crim. Proc. Ann. art. 17.44 (electronic monitoring).

Having considered the evidence before the district court in the light most favorable to the court's ruling, and having measured the court's ruling against the criteria informing the setting of pretrial bail, we conclude that the court abused its discretion by continuing Digman's bail at $1,000,000.  We order that bail be set at $150,000, subject to such reasonable terms and conditions as may be determined by the district court.

_____

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Pemberton

Reversed and Rendered

Filed:   June 24, 2004

Do Not Publish